UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF INDIANA, )<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BP PRODUCTS NORTH AMERICA, INC., )<br>)<br>)<br>Defendant. ) | Cause No. 2:23-CV-166-PPS-JEM |

## OPINION AND ORDER

On May 17, 2023, the government filed this enforcement action against Defendant BP Products North America, Inc., seeking to redress air pollution at BP Products' petroleum refinery in Whiting. [DE 1.] Along with its complaint, the government filed notice of a proposed consent decree seeking to resolve the alleged CAA violations. [DE 2.] The proposed consent decree was published in the Federal Register and public comments were solicited. 88 Fed. Reg. 33648-01, 2023 WL 3600358 (May 24, 2023). The thirty-day comment period has closed, and the government now requests that I enter the decree. [DE 4; DE 4-1; DE 5.] BP Products consents to entry of the decree and the parties agree that the motion is unopposed. [DE 4 at 1.]

In sum, because the proposed consent decree is fair, reasonable, adequate, and consistent with applicable law, the government's motion will be granted, and the decree will be entered.

## Background

The Whiting Refinery and alleged pollution stemming from the facility have been the subject of enforcement proceedings in this district for decades. In 2001, my colleague entered a consent decree addressing air pollution at various BP refineries, including the Whiting Refinery. *See* DE 130, *United States v. BP Exploration & Oil Co.*, No. 2:96-CV-095-TLS-APR. That decree was subsequently modified twelve times, most recently in May 2020.

In 2005, the Environmental Protection Agency discovered new evidence of CAA violations during an inspection of the facility and proceeded to issue findings and notices of violations. The government alleged BP Products, as part of an expansion project to enable the refinery to process Canadian tar sands and crude oil, had modified certain process units at the Whiting Refinery, in violation of the CAA's Prevention of Significant Deterioration and Non-Attainment New Source Review requirements. In May 2012, a new enforcement action was filed against BP Products based on these alleged violations. *See United States v. BP Prods. N.A., Inc.*, No. 2:12-CV-207-PPS-APR.

The parties reached a compromise to resolve the 2012 case. Due to the broad and comprehensive nature of the injunctive relief agreed upon by the parties, they opted to lodge a new standalone consent decree that applied only to the Whiting Refinery, rather than making significant material changes to the 2001 consent decree, which was broader in scope. The 2012 consent decree required BP Products to undertake significant remedial measures at the Whiting Refinery in order to prevent future CAA violations

and mitigate excess emissions of harmful air pollutants resulting from its alleged non-compliance. BP was also required to pay stipulated penalties and perform a Supplemental Environmental Project to monitor for pollutants around the perimeter of the facility. On November 6, 2012, I found the proposed 2012 consent decree fair, reasonable, and consistent with the CAA's statutory purposes, and adopted the decree as an order of the Court. [DE 9, Cause No. 2:12-CV-207-PPS-APR.] It has since been modified four times by agreement.

As the government explains in its brief [DE 5 at 2–3], this new case picks up where the 2012 consent decree left off. Between 2018 and 2019, inspections at the refinery's Lakefront Wastewater Treatment Plant uncovered violations of the CAA, National Emission Standards for Hazardous Air Pollutants "NESHAP" for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF ("BWON") and the New Source Performance Standards ("NSPS") for VOC Emissions from Petroleum Refinery Wastewater Systems, 40 C.F.R. Part 60, Subpart QQQ ("Subpart QQQ"). *Id.* at 3–4. The EPA again issued detailed findings and notices of violations. Those findings form the basis of the government's new complaint. The complaint delineates how BP Products polluted the air with deficient practices that violate three distinct regulatory programs – namely, violations of BWON [DE 1, ¶¶ 71–81], Subpart QQQ [*id.*, ¶¶ 87–90, 91–92], and good air pollution control practice requirements in the NSPS and NESHAP general provisions [*id.*, ¶¶ 100–07].

3

To resolve these claims, the government and BP Products have again reached a compromise – a new proposed consent decree targeting alleged non-compliance with BWON and Subpart QQQ. The terms of the proposed consent decree would require BP Products to undertake extensive measures at the Whiting Refinery in order to prevent further BWON and Subpart QQQ violations. It encompasses an array of things, including capital projects to address benzene emissions, air pollution monitoring, technological improvements, and improved internal monitoring, repair, and compliance requirements, among other measures designed to ensure BP Products adheres to air pollution standards. Moreover, BP will pay a civil penalty of $31,424,000.00, as well as a stipulated penalty of $8,576,000.00 for its violations of the 2012 consent decree, for a total fine of $40 million. And the decree contains stipulated penalties designed to incent BP Products' compliance going forward. Finally, BP Products agrees to spend $5 million to implement a supplemental environmental project in the communities of Hammond, East Chicago, Whiting, and Gary, involving replacing diesel transportation vehicles with lower-emissions vehicles.

Reasonable minds may wonder why the parties didn't simply seek to amend the 2012 consent decree to address the new alleged violations at the Whiting Refinery, rather than filing a new case concerning the same facility. Although the 2012 consent decree could have been modified to incorporate the new provisions currently before me, the parties determined that instead of making "sweeping amendments" to the preexisting consent decree, it "would be more efficient to streamline [BP Products'] compliance

4

obligations and to provide enforcement clarity for the regulatory agencies" by agreeing to a standalone settlement. [DE 5 at 2.] The parties have agreed to simultaneously amend the terms of the 2012 consent decree through a Fifth Amendment. [*See* Unopposed Motion to Enter, DE 91, No. 2:12-CV-207-PPS-APR.] The Fifth Amendment terminates provisions from the 2012 consent decree related to benzene waste operations standards, so as to "to avoid confusion and to ensure the more stringent and more frequent measures in the 2023 Consent Decree control." [DE 5 at 2.] The idea is that by removing these overlapping BWON provisions in the 2012 consent decree and replacing them with the provisions of the new proposed consent decree in this case, the parties can "consolidate and strengthen the BWON-related compliance measures in a single document." [DE 91 at 2, Cause No. 2:12-CV-207-PPS-APR.] The only other changes to the 2012 consent decree contemplated by the parties are nonmaterial updates to Appendix B – first, an update to the definition of "Certified Low-Leaking Valve Packing Technology," to align with new technical developments; and second, a modification to the repair/replace timeline for newly-replaced valves to permit a repair attempt prior to repairing/replacing the same valve again. *Id.*

In other words, rather than refurbishing the 2012 consent decree wholesale, the parties are in agreement that the most effective path toward remediating the pollution now at issue at the Whiting Refinery is to enter a new, standalone consent decree in this case, and simultaneously amend the terms of the preexisting consent decree to avoid "confusing overlap" in their substantive terms. Having independently reviewed the

5

proposed terms of the settlement in this case and the proposed amendments to the decree entered in the 2012 case, I agree with the parties' two-pronged approach to addressing the new alleged violations while eliminating potential conflicts with BP Products' obligations under the 2012 consent decree. By separate order, the Fifth Amendment to the 2012 consent decree will be entered concurrently with the proposed consent decree in this case.

## Discussion

In the context of environmental enforcement actions, consent decrees promote efficiency by allowing for "extensive relief" while "free[ing] up enforcement resources for use elsewhere." *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 825 (7th Cir. 2015); *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1054 (N.D. Ind. 2001). Courts in this circuit approve a consent decree if it is "procedurally and substantively fair," reasonable, and "adequately protects and is consistent with applicable law." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011); *United States v. United States Steel Corp.*, 2021 WL 3884852, at *6 (N.D. Ind. Aug. 30, 2021); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1049.

In reviewing a consent decree, a district court "need not inquire into the precise legal rights of the parties, nor reach and resolve the merits of the parties' claims." *BP Expl. & Oil Co.*, 167 F. Supp. at 1049 (citing *Metro Housing Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). While I am not permitted to simply "rubberstamp approval in favor of an independent evaluation" of the issues presented, a

strong public policy favors voluntary settlement of litigation, and "[t]his presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the Environmental Protection Agency . . . , which enjoys substantial expertise in the environmental field." *Id.* at 1050 (citations omitted); *see also, e.g.*, *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wisc. 2004).

Thus, in evaluating whether to approve a consent decree settlement, courts consider the following three factors: (1) fairness, both procedural and substantive; (2) reasonableness; and (3) consistency with applicable law. *George A. Whiting Paper Co.*, 644 F.3d at 372; *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). As explained below, I find that the proposed consent decree satisfies each of these criteria.

### I.     Procedural Fairness

A consent decree settlement is procedurally fair if the negotiations in reaching the settlement were open and at arms-length. *In re Tutu*, 326 F.3d at 207 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)); *see United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019–20 (8th Cir. 2002), *cert. denied*, 537 U.S. 942 (2002); *United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001). The proposed decree is procedurally fair because, as the government asserts, it is the product of "sustained arm's length negotiations between and among the United States, Indiana, and [BP Products]," in which each party "had experienced counsel and technical representatives present

7

throughout the negotiations who vigorously advocated their respective positions." [DE 5 at 11.]

A couple other factors support my conclusion that the proposed settlement is procedurally fair. These are the same parties that negotiated the 2012 consent decree, and they are obviously familiar with the complex air pollution issues that have plagued the Whiting Refinery for decades. *Id.* at 12. This has been a long-term effort to address highly complex air quality issues. As noted, the proposed consent decree was lodged in the Federal Register for the required 30-day period, during which time public comments were solicited and received. Finally, there is no evidence that the negotiations were conducted in bad faith or that the proposed settlement is the product of improper collusion. *See BP Oil Expl. & Oil Co.*, 167 F. Supp. 2d at 1050.

**II.     Substantive Fairness**

Substantive fairness involves "concepts of corrective justice and accountability." *United States v. Comunidades Unidas Contra La Contaminacion,* 204 F.3d 275, 281 (1st Cir. 2000). I am guided by the notion that "a party should bear the cost of the harm for which it is legally responsible." *Id.*; *Cannons Eng'g,* 899 F.2d at 87. I find that the proposed settlement is substantively fair. The array of required injunctive measures and penalties will address the well-pled allegations in the government's complaint and prevent similar non-compliance with BWON and Subpart QQQ moving forward. Moreover, the likely alternative to the proposed consent decree would be lengthy, technically complex, expensive, and resource-intensive litigation on the merits of each of the government's

8

claims for relief. In sum, the proposed consent decree would hold BP Products accountable for its alleged non-compliance with air quality regulations while mitigating the costs and potential delays associated with litigating the government's claims on the merits. I am therefore satisfied that its terms meet the standards of accountability and corrective justice required under the substantive fairness prong of the analysis.

### III. Reasonableness

Courts in this circuit evaluate the reasonableness of a proposed consent decree in light of a number of factors, including "its likely efficaciousness as a vehicle for cleansing the environment; the extent to which it satisfactorily compensates the public for actual and anticipated costs of remedial and response measures; the extent to which approval of it serves the public interest; and the availability and likelihood of alternatives to the consent decree." *United States v. BP Prods. N.A., Inc.*, 2012 WL 5411713, at *3 (N.D. Ind. Nov. 6, 2012) (collecting cases).

The proposed consent decree is reasonable in view of these factors. The government notes that it relied upon the EPA's expertise in designing the injunctive measures in the decree, as reflected in significant estimated reductions of benzene, volatile organic compound ("VOCs"), and other hazardous air pollutants ("HAPs"). [DE 5 at 14.] The decree is reasonably designed to compensate the public for the alleged violations by requiring BP Products to implement corrective measures at a cost of nearly $200 million, and by requiring BP Products to pay $40 million for its violations of the 2012 consent decree and non-compliance with BWON and Subpart QQQ. Increased

reporting and monitoring requirements, as well as the diesel emissions reduction SEP, will tangibly benefit the local community by improving the quality and accuracy of information about the facility's emissions and mitigating the effects of harmful air pollutants. Finally, the benefits to the public interest secured by the decree are achieved more quickly and at lower cost than could reasonably be achieved through litigation. Accordingly, I conclude the consent decree is in the public interest and its terms are reasonable.

### IV.  Consistency with the Clean Air Act

In evaluating whether a consent decree is in the public interest, courts consider whether the decree is "consistent with the public objectives sought to be attained by Congress." *United States v. Lexington-Fayette Urban Cnty Gov't*, 591 F.3d 484, 490 (6th Cir. 2010) (quoting *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983)); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1049 ("[T]he most important factor as to public policy is whether the decree comports with the goals of Congress"). "Of necessity, consideration of the extent to which consent decrees are consistent with Congress' discerned intent involves matters implicating fairness and reasonableness" and "cannot be viewed in majestic isolation." *Cannons Eng'g*, 899 F.2d at 90.

The proposed consent decree is consistent with the public objectives animating the Clean Air Act. BP Products will pay for its past non-compliance, agree to a schedule of stipulated penalties for any future violations of BWON and Subpart QQQ, and take up substantial remedial measures at the Whiting Refinery to reduce emissions of

hazardous air pollutants going forward. The settlement will thus "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *See* 42 U.S.C. § 7401(b)(1). Accordingly, I conclude that the consent decree is consistent with the goals of the Clean Air Act and furthers the public interest.

### V. Public Comments

The government received five public comments concerning the proposed settlement. Three comments were from local residents who supported the settlement for various reasons. [DE 5-1; DE 5-2; DE 5-3.] Two comments were critical of the settlement – one from an industry trade association (the American Fuel and Petrochemical Manufacturers ("AFPM")), and the other from an anonymous member of the public. [DE 5-4; DE 5-5.] Neither commenter has sought to intervene in this case to formally oppose entry of the proposed settlement.

The latter two comments raise three concerns with the proposed consent decree – it (1) constitutes "regulation by consent decree"; (2) has impacts beyond the parties to the settlement; and (3) compels injunctive measures beyond those required by the CAA and associated regulations. The first and second arguments—that the government could promulgate new 'regulations' on enterprise generally through entry of a settlement resolving specific allegations in an enforcement action filed against a company alleged to have violated the CAA—carry no water. The proposed consent decree is a settlement, not a decision on the merits of the government's claims. *Cf. United States v. Alshabkhoun*,

11

277 F.3d 930, 934 (7th Cir. 2002) ("A consent decree is a court order that embodies the terms agreed upon by the parties as a compromise to litigation. For purposes of construction, a judicially approved consent decree is essentially a contract.") (citations omitted).

On one hand, AFPM acknowledges that its members cannot be bound by the terms of a settlement to which they have not consented, and on the other hand, raises the specter that the government will seek to apply the terms of the consent decree more broadly to other industry participants. [DE 5-5 at 2 n.3.] But under the plain terms of the proposed settlement, the only player in the industry bound to follow its terms is BP Products. It has elected to do so after years of investigation and negotiation with the government, but that does not require any other industry participant to follow the same course. *See King v. Walters*, 190 F.3d 784, 788 (7th Cir. 1999) ("[G]enerally speaking, a district court abuses its discretion when it enters a consent decree that purports to bind a party that did not agree to the decree's terms."); *see, e.g., Magee v. Portfolio Recovery Ass'ns*, LLC, 2012 WL 3560996, at *4 (N.D. Ill. 2012) ("[P]arties who sign a consent agreement cannot impose duties or obligations on a third party without that third party's consent."). In short, if another member of the industry faced a similar enforcement action alleging violations of the Clean Air Act, they would be free to dispute the claims on the merits; there would be no "regulation by consent decree" forcing them to resolve the claims on the same terms as BP Products.

The final concern raised by the comments, that the proposed consent decree exceeds statutory or regulatory remedies authorized by the Clean Air Act, is also immaterial. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1050 (noting a "federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the Court could have awarded after a trial") (citations omitted). AFPM acknowledges as much. [DE 5-5 at 2 n.2 (noting settlements may "include terms beyond the remedies provided in a specific statute").]

The government points me to a helpful example of where the proposed consent decree goes beyond remedies codified in the Clean Air Act and associated regulations and explains why this is not a cause for concern. [DE 5 at 19.] During the initial monitoring period under the decree, BP Products must test some of its tanks for compliance with the NDE standard ("Method 21") testing method on a monthly basis, rather than an annual basis as required under the regulation. [DE 2, ¶ 26(a).] *See* 40 C.F.R. §§ 61.343(a)(1)(i)(A), 61.355(h). Sure, that requirement goes beyond the regulation – but as the government notes, that is deliberately the case, because monthly testing is more likely to "address systemic BWON violations at the Whiting Refinery that two prior judicial consent decrees (2001 and 2012) failed to correct." [DE 5 at 19.] In no sense does this term in the consent decree amend BWON, constitute "rulemaking by consent decree," or subject any other industry participant other than BP Products to monthly, rather than annual, Method 21 tank monitoring.

13

**Conclusion**

For the foregoing reasons, I find that the proposed consent decree is fair, reasonable, and consistent with the Clean Air Act's statutory purposes. Therefore, the government's unopposed motion to enter the proposed consent decree [DE 4] is **GRANTED**. Accordingly, the Court accepts and enters the government's proposed consent decree [DE 4-1] as an order of the Court. The Clerk is **DIRECTED** to **ENTER** this filing [DE 4-1] as the parties' Consent Decree in this matter and to administratively close the case. The Consent Decree will be entered and effective as of the date of this order.

**SO ORDERED**.

ENTERED: August 9, 2023.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT